IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| DAVID A. CAMPBELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:04CV989 |
| | ) | |
| JOHN E. POTTER, POSTMASTER | ) | |
| GENERAL, UNITED STATES | ) | |
| POSTAL SERVICE, | ) | |
| | ) | |
| Defendant. | ) | |

FINDINGS OF FACT AND CONCLUSIONS OF LAW

BEATY, District Judge.

This case came before the Court for a bench trial on Thursday, April 6, 2006 and Friday, April 7, 2006. Plaintiff David A. Campbell ("Plaintiff") brought this case against his employer, Defendant John E. Potter as the Postmaster General of the United States Postal Service ("Defendant") alleging employment discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., based on his contention that his supervisor required him to regularly work on his Saturday relief day, allegedly in retaliation for filing an EEO complaint.

I.  LEGAL STANDARD

Title VII prohibits the United States Postal Service from discriminating against its employees on the basis of race in its personnel actions. See § 42 U.S.C. 2000e-16. Regardless of

the type of evidence offered, "[t]he ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 286 (4th Cir. 2004). The judicially-created scheme of proof established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), requires that a plaintiff first establish a prima facie case of discrimination. Hill, 354 F.3d at 285. To demonstrate a prima facie case of discrimination under Title VII, a plaintiff must show that (1) he is a member of a protected class, (2) an adverse employment action occurred, (3) he was performing his job duties at a level that met his employer's legitimate expectations at the time of the adverse employment action, and (4) similarly-situated employees outside his protected class received more favorable treatment. See McDonnell Douglas Corp., 411 U.S. at 802, 93 S. Ct. at 1824; White v. BFI Waste Servs., LLC, 375 F.3d 288, 295 (4th Cir. 2004). In addition, to establish a prima facie case of retaliation, a plaintiff must show (1) he engaged in a protected activity; (2) the employer took adverse employment action against him; and (3) a causal connection existed between the protected activity and the adverse action. Price v. Thompson, 380 F.3d 209, 212 (4th Cir. 2004).[1] Once a

---

[1] The Fourth Circuit has not expressly declared that Title VII gives federal employees the right to bring a retaliation claim. See Laber v. Harvey, 438 F.3d 404, 432 n.30 (4th Cir. 2006) (recognizing that the Fourth Circuit Court of Appeals has never squarely held that Title VII gives federal employees the right to bring a retaliation claim); Bagir v. Principi, 434 F.3d 733, 747 n.16 (4th Cir. 2006) (observing that 42 U.S.C. § 2000e-16 does not expressly provide federal employees with a retaliation cause of action). However, the applicable regulations specifically prohibit retaliation against federal employees, and the Fourth Circuit has proceeded in retaliation cases by assuming that such a claim exists. Therefore, this Court will likewise proceed to the merits of the claim, assuming that a retaliation claim could exist for a federal employee.

plaintiff has established his prima facie case, the defendant must respond with evidence that it acted with a legitimate, nondiscriminatory purpose. McDonnell Douglas Corp., 411 U.S. at 802, 93 S. Ct. at 1824. If the defendant meets this burden of production, the presumption of discrimination created by the prima facie case vanishes, requiring the plaintiff to prove that the defendant's proffered reason is a pretext for discrimination in order to recover. Id. at 804, 93 S. Ct. at 1825. Applying this standard in the present case, and based on the evidence presented during the trial in this matter, the Court makes the following findings of fact and conclusion of law.

II. FACTUAL FINDINGS

Plaintiff began working for the Postal Service as an auxiliary rural carrier in the High Point Post Office in November 1998. In February 2000, Plaintiff became a regular rural carrier assigned to "Route 18." At that time, Route 18 was designated as a "J" route, which entitled Plaintiff, under the terms of his union agreement, to a relief day every other week. On June 16, 2001, Plaintiff's route was adjusted and was changed from a "J" route to a "K" route.[2] At or around that time, Ms. Toni Agner became Plaintiff's supervisor.

Under the terms of Plaintiff's union agreement, once Plaintiff's route was changed to a "K" route, he was entitled to a relief day each week. (See Agreement between the United States Postal Service and the National Rural Letter Carriers' Association, Article 9.2.C.6). Plaintiff's

---

[2] Postal service routes are given "H", "J", or "K" letter designations based on the number of stops and amount of mail to be delivered. The designation affects the carrier's relief day and can affect the carrier's compensation.

3

relief day was designated as a Saturday unless mutually changed by Plaintiff and his supervisor. Plaintiff did not change his relief day, and therefore would have been entitled to a Saturday relief day. However, under the terms of the union agreement, if sufficient "subs" were not available to cover all of the routes, regular carriers could be required to work on their relief day, and were to be compensated at 150% pay for that day, or were to be given an alternate relief day and 50% premium pay. (See id., Article 9.2.C.5.f.). Under the terms of the union agreement, regular carriers could volunteer to work their relief day if sufficient "subs" were not available. However, if there were not enough volunteers, regular carriers were required to work as needed based on their juniority in the office. (See id., Article 8.5.A ("When a regular rural carrier is needed to work a relief day, due to the unavailability of a leave replacement, the Employer will . . . requir[e] regular carriers not on the [volunteer] list to work the relief day. Such requirement will be by juniority.")).

In addition, the union agreement further provided that if a post office had a sufficiently low number of available "subs," the post office could implement a formula that would require the most junior regular carriers to pick some other day of the week as a relief day (other than Saturday), and that carrier would no longer be entitled to any Saturday relief days. (See id., Article 9.2.C.5.b. and 9.2.C.5.d.(2) (providing that if an office has a low number of subs and not enough volunteers take alternate relief days, "the Employer may assign a relief day other than Saturday to those K routes with a Saturday relief day, based on juniority in the office.")).

In this case, from June 2001 through November 2001, Plaintiff generally took a relief day

4

relief day was designated as a Saturday unless mutually changed by Plaintiff and his supervisor. Plaintiff did not change his relief day, and therefore would have been entitled to a Saturday relief day. However, under the terms of the union agreement, if sufficient "subs" were not available to cover all of the routes, regular carriers could be required to work on their relief day, and were to be compensated at 150% pay for that day, or were to be given an alternate relief day and 50% premium pay. (See id., Article 9.2.C.5.f.). Under the terms of the union agreement, regular carriers could volunteer to work their relief day if sufficient "subs" were not available. However, if there were not enough volunteers, regular carriers were required to work as needed based on their juniority in the office. (See id., Article 8.5.A ("When a regular rural carrier is needed to work a relief day, due to the unavailability of a leave replacement, the Employer will . . . requir[e] regular carriers not on the [volunteer] list to work the relief day. Such requirement will be by juniority.")).

In addition, the union agreement further provided that if a post office had a sufficiently low number of available "subs," the post office could implement a formula that would require the most junior regular carriers to pick some other day of the week as a relief day (other than Saturday), and that carrier would no longer be entitled to any Saturday relief days. (See id., Article 9.2.C.5.b. and 9.2.C.5.d.(2) (providing that if an office has a low number of subs and not enough volunteers take alternate relief days, "the Employer may assign a relief day other than Saturday to those K routes with a Saturday relief day, based on juniority in the office.")).

In this case, from June 2001 through November 2001, Plaintiff generally took a relief day

4

on his regular Saturday relief days, but had to work on some Saturdays when subs were not available. On October 11, 2001, Plaintiff filed an EEO complaint related to an incident that occurred in July 2001.[3] After filing his October 11, 2001 EEO complaint, Plaintiff was able to take his Saturday relief day on the next four Saturdays: October 13, October 20, October 27 and November 3, 2001. However, during the subsequent period from November 10, 2001 through May 11, 2002, Plaintiff was required to work 22 out of 27 times on his Saturday relief day. On April 25, 2002, Plaintiff filed a second EEO complaint contending that this Saturday scheduling was discrimination and retaliation for filing the October 11, 2001 EEO complaint.[4]

Based on the evidence presented at trial, the Court finds that Plaintiff was the most junior regular carrier in the High Point Post Office from November 10, 2001 through May 11, 2002. As such, he was required to work on Saturdays pursuant to the terms of the union agreement because there were too few subs in the High Point Office at that time. The Court finds that

---

[3] On July 30, 2001, Plaintiff became involved in an argument with one of the subs who had covered his route the previous Saturday. As a result of their argument, the sub became ill and was unable to work. Plaintiff received notice of a 7-day suspension from Ms. Agner. Plaintiff thereafter contacted an EEO counselor on August 3, 2001 with regard to this suspension. Plaintiff later filed a formal EEO complaint on October 11, 2001. The suspension was later withdrawn in a separate proceeding.

[4] Defendant contends that Plaintiff failed to exhaust his administrative remedies as to some of the Saturday claims because some of the Saturdays occurred more than 45 days prior to Plaintiff's contact with the EEO counselor. See 29 C.F.R. § 1614.105(a)(1) (requiring federal employees to contact an EEO counselor within 45 days of the alleged discriminatory action). However, the Court will proceed to the merits of Plaintiff's claims in this case, since Defendant concedes that at least some of the Saturdays (those after January 6, 2002) were within the 45 day period.

there were not sufficient subs available to cover all of the routes. In addition, the Court finds that several regular carriers, including J. Clinard, R. Smith, T. Hedrick, and B. Singh, were out for extended leave for medical reasons during parts of this period, requiring their own subs to cover their routes and leaving fewer available subs to cover the remaining carriers. Therefore, regular carriers were often required to work on Saturdays. The Court specifically finds that there is no credible evidence that there were trained subs available who expressed a specific desire to cover Plaintiff's route on the Saturdays that Plaintiff was required to work. In fact, Plaintiff's supervisor, Ms. Agner, credibly testified that Plaintiff was only required to work on Saturdays when there were no trained subs available to cover his route. Because there were not enough subs available, under the terms of the union agreement, Plaintiff as the most junior regular carrier was required to work. Once additional subs were hired in June and July of 2002, Plaintiff was able to regularly take his Saturday relief day again.

In addition, the Court finds that on several occasions during the period from November 10, 2001 through May 11, 2002, Plaintiff took a Saturday relief day while other, more senior carriers worked on their Saturday relief days during this period, even though they were not required to do so under the terms of the union agreement. As a result, Plaintiff was able to take his relief day on Saturday on a least five occasions during this period, even though, as the most junior regular carrier, he could have been required to work. The Court also finds that when Plaintiff was required to work on Saturday, he received an alternate relief day and premium pay, as required by his union agreement. Therefore, Plaintiff received his relief days consistent with

6

the terms specified in the union agreement, and in fact sometimes received his Saturday relief day even when more senior carriers were required to work on their Saturday relief days.

Moreover, the Court further finds that, given the low number of available subs, Defendant would have been entitled to invoke the provisions of Article 9.2.C.5.d.(2) of the union agreement and require Plaintiff, as the most junior regular carrier, to choose some other day of the week as his relief day. If that provision had been invoked, Plaintiff would not have received any Saturday relief days, and would have been required to take some other day of the week as his relief day. However, rather than requiring Plaintiff to choose an alternative relief day, Defendant instead allowed the carriers to work out coverage issues. As a result, Plaintiff was able to take his relief day on Saturday on at least some occasions, and received premium pay when he was required to work on Saturday. Therefore, the Court finds that Plaintiff actually received more beneficial treatment than he was entitled to if Article 9.2.C.5.d.(2) of his union agreement had been invoked with regard to his Saturday relief day.

III.  CONCLUSIONS OF LAW

Having reviewed and considered all of the evidence and arguments presented by the parties, and the Court concludes that Plaintiff has failed to establish by a preponderance of the evidence that Defendant intentionally discriminated against him, either on the basis of race or retaliation. Specifically, the Court first concludes that Plaintiff has failed to establish that he was subjected to an adverse employment action or that Defendant took any discriminatory or retaliatory action against him. As noted above, for every Saturday Plaintiff worked, he received

alternate days off and premium pay as provided for in the union agreement between the Postal Service and the National Rural Letter Carriers' Association. In addition, Plaintiff received some Saturdays off during the period from November 10, 2001 through May 11, 2002, when other, more senior carriers with Saturday relief days worked on those Saturdays even though they were not required to do so, so that Plaintiff could have a Saturday off. Finally, because the Postal Service did not invoke Article 9.2.C.5.d.(2) of the union agreement to require Plaintiff to select another relief day, Plaintiff actually received more beneficial treatment than he was entitled to under the terms of his union agreement with regard to his Saturday relief day. Given these circumstances, the Court concludes that Defendant did not take any adverse action against Plaintiff, as required to establish a prima facie case of discrimination or retaliation.

In addition, the Court concludes that there was no causal connection between any protected activity and the increased need for Plaintiff to work on Saturdays. In fact, Plaintiff was given multiple Saturday relief days after he made contact with an EEO Counselor in August 2001, and was given multiple Saturday relief days immediately after he filed his EEO Complaint in October 2001. Plaintiff was subsequently required to work on Saturday due to the decreasing number of subs, the extended sick leave of other carriers during the time period, which required the use of subs to cover those routes, and Plaintiff's juniority in the office. Therefore, the Court concludes that Plaintiff has failed to establish a causal connection between any protected activity and any action by Defendant, as required to establish a prima facie case of retaliation.

Moreover, even if Plaintiff could establish a prima facie case of discrimination or

8

retaliation, which the Court finds that he has failed to do, the Court further concludes that Defendant has presented a legitimate, non-discriminatory reason for the Saturday scheduling. Specifically, the Court concludes that Plaintiff was required to work on Saturdays as required by his union contract in order to meet the genuine business needs of the Postal Service, due to the low number of "subs" available, the unavailability of a trained "sub" to cover Plaintiff's route, and Plaintiff's lack of seniority in the office. Therefore, the Court concludes that Defendant has established a legitimate, non-discriminatory reason for its Saturday scheduling, and Plaintiff has not shown that Defendant's reasoning is a pretext for discrimination or retaliation.

For all of these reasons, the Court concludes that Plaintiff has failed to establish that Defendant intentionally discriminated against him, either on the basis of race or retaliation. The Court will therefore enter Judgment in favor of Defendant on all of Plaintiff's claims in this case. A Judgment consistent with these Findings and Conclusions will be entered contemporaneously herewith.

This, the 20th day of April, 2006.

_____
United States District Judge